## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SANDRA KAY JOHNSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:15-CV-3961-BH |
| | § | |
| NANCY A. BERRYHILL, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Consent |

### <u>MEMORANDUM OPINION AND ORDER</u>

Pursuant to the consent of the parties and the order of reassignment dated March 2, 2016 (doc. 17), this case has been transferred for the conduct of all further proceedings and the entry of judgment.  Before the Court are *Plaintiff's Brief in Support of Claim*, filed May 12, 2016 (doc. 22), and *Defendant's Response Brief*, filed June 9, 2016 (doc. 24).   Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

### I.   BACKGROUND[1]

#### A.   <u>Procedural History</u>

Sandra Kay Johnson (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner of Social Security (Commissioner)[2] partially denying her claims for disability insurance benefits (DIB) under Title II of the Social Security Act (Act) and for supplemental security income (SSI) under Title XVI of the Act.  (R. at 1, 18.)  Plaintiff filed her applications for DIB and SSI on July 1, 2010, and August 18, 2010, respectively, alleging disability beginning on

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

[2]   At the time of filing of this appeal, Carolyn W. Colvin was the Acting Commissioner of the Social Security Administration, but she was succeeded by Nancy A. Berryhill beginning January 20, 2017.

April 1, 2009.[3]  (R. at 364-69.)  Her claims were denied initially and upon reconsideration.  (R. at 171-74.)  Plaintiff requested a hearing before an administrative law judge (ALJ), and she personally appeared and testified at a hearing on October 12, 2012.  (R. at 45-63.)  On December 14, 2012, the ALJ issued a decision finding that Plaintiff was not disabled and denying her claims for benefits.  (R. at 175-94.)  She timely appealed to the Appeals Council, which granted her request for review and remanded the decision to the ALJ for additional consideration on March 26, 2014.  (R. at 195-99.)

On July 8, 2014, Plaintiff personally appeared and testified at a second hearing before the ALJ.  (R. at 109-46.)  The ALJ partially denied her claims, finding that she was not disabled prior to March 19, 2014, but became disabled on that date and continued to be disabled thereafter.  (R. at 18-44.)  Plaintiff timely appealed the ALJ's decision to the Appeals Council on December 8, 2014.  (R. at 17.)  The Appeals Council denied her request for review on October 14, 2015, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-7.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

**B.**     **Factual History**

**1.**     **Age, Education, and Work Experience**

Plaintiff was born on March 20, 1959, and was 55 years old at the time of the second hearing before the ALJ.  (R. at 109-15, 364.)  She left school in the 10th grade and never received a GED.  (R. at 113.)  She had past relevant work experience as a cashier, hospital food service worker, and home attendant.  (R. at 33.)

---

[3]  Plaintiff previously applied for DIB and SSI on July 3, 2006, and September 18, 2007, but her applications were both denied.  (R. at 22, 168-69.)  The oral hearing transcripts and decisions from these prior applications are included in the record, but they will not be recited here as she is not appealing those denials.  (R. at 64-108, 147-62, 163-70.)

### 2.      Medical Evidence

On May 31, 2006, Plaintiff was admitted to the Bluitt-Flowers Health Center of the Parkland Health and Hospital System (Parkland) for back and hip pain.  (R. at 536-38.)  She had slipped on a wet floor and landed on her right side.  (R. at 537.)  Tenderness was found in her right lumbar spine area, and she was diagnosed with right hip and knee pain.  (R. at 537-38.)  X-rays taken the next day showed that her right hip had a "subtle sclerotic linear density" that was "possibly due to impacted fracture or previous stress line," and that her right knee was "normal."  (R. at 527-28, 543.)

On September 11, 2007, Plaintiff was transported by ambulance to the emergency room of Renaissance Hospital after a fire broke out in her home.  (R. at 547-56.)  She reported that she had to "wake and assist" her son out of the house, and that she suffered moderate pain in her head, chest, hip, and back.  (R. at 548.)  There was no evidence of tenderness or trauma, but there was a limited range of motion in her right hip.  (R. at 548-49.)  It was noted that Plaintiff was "making effort to not cooperate [with the] basic exam," but there were no problems with her orientation, mood, or confusion.  (R. at 548.)  She was diagnosed with smoke inhalation and potential psychological issues.  (R. at 550, 555.)

On September 27, 2007, Plaintiff met with Dr. Charles Tuen, M.D., for her headaches.  (R. at 591-94.)  Dr. Tuen noted a normal physical exam with no tenderness, good upper and lower extremity strength, and "mild limping" in her gait.  (R. at 592-93.)  During the neurological exam, Plaintiff had good orientation, a normal fund of knowledge, normal recent and remote memory, and the ability to cooperate and follow conversations without problem.  (R. at 592.)  Dr. Tuen diagnosed her with tension headaches potentially caused by smoke inhalation due to her house fire.  (R. at 593-94.)

3

Between January 8, 2008, and July 3, 2014, Plaintiff regularly received mental health counseling and prescription medications from Dallas Metrocare Services (Metrocare).  (R. at 603-616, 740-54, 863-905, 932-41, 1037-57, 1134-237, 1294-1315, 1348-50.)  At her initial evaluation, she was diagnosed with major depressive disorder without psychotic features and was assigned a Global Assessment of Functioning (GAF) score of 49.  (R. at 603.)  It was consistently noted that she had coherent speech, no paranoia, an intact memory, and fair attention/concentration, but it was also noted that she was easily frustrated and irritable.  (R. at 608, 616, 743, 747, 875, 884, 892-93, 898, 937-38, 1039, 1042-43, 1055-56, 1212, 1215, 1224, 1236-37, 1295, 1301, 1311.)  During her sessions in 2010, Plaintiff reported that she had been tripling her pain and anti-depressant medication because they were "just not strong enough," and that she would change clinics if they did not increase her medications.  (R. at 889-93, 904-05, 938.)  The increase was denied, but she was prescribed a different type of anti-depressant medication.  (R. at 1043, 1046.)

On February 19, 2008, Plaintiff met with Dr. Ingrid J. Zasterova, M.D., for an internal medicine consultative examination.  (R. at 596-601.)  Dr. Zasterova reported that she had "5/5" muscle strength in all extremities and a full range of motion in her neck and joints, with the exception of "some discomfort" in her right hip and minor limitation in her lumbar spine.  (R. at 598, 601.)  Plaintiff had a normal station and gait, could toe, heel, and tandem walk, and could "move around the room without her assistive device."  (R. at 598.)  Dr. Zasterova's clinical impressions were trochanteric bursitis in her right hip with no evidence of other abnormalities.  (R. at 598.)

On April 16, 2008, Plaintiff returned to Parkland for pain in her right hip and lower back.  (R. at 618-20.)  She reported the pain as being "6/10" when moving or walking.  (R. at 619.)  Besides tenderness in her lower lumbar spine, there were no abnormal findings during her physical

exam.  (R. at 619.)  She was prescribed pain medication and instructed to return if the pain became worse.  (R. at 620.)

On July 11, 2008, Plaintiff met with Dr. Mark W. Matthews, Ph.D., for a psychological consultative examination.  (R. at 634-42.)  She reported a history of panic attacks and was "ambivalent" about having a history of depressive episodes.  (R. at 637.)  Dr. Matthews opined that she had an impaired attention and concentration, difficulty with her short and long-term memories, limited insight, and adequate judgment.  (R. at 639.)  He diagnosed her with panic disorder without agoraphobia, assigned her a GAF score of 55, and offered a guarded prognosis.  (R. at 640.)  Dr. Matthews also "expect[ed] the course of treatment will be challenging because [Plaintiff] appear[ed] uninterested" in treatment for her mental issues.  (R. at 640.)

On September 30, 2008, Plaintiff returned to Parkland for pain in her right hip.  (R. at 650-55.)  She had a normal gait, but she had "a little difficulty in walking [without] pain."  (R. at 652.)  She received X-rays of her right hip that showed "subtle osteoarthritis . . . with minimal spur formation" and "no joint space narrowing."  (R. at 655.)  She returned on December 14, 2008, for an MRI on her lumbar spine.  (R. at 653.)  The MRI results were generally "unremarkable" but did show "minimal posterior disc bulge which on sagittal images [did] not significantly impinge the thecal sac."  (R. at 653.)  The overall impression was degenerative disc change.  (R. at 654.)

On January 6, 2009, Plaintiff returned to Parkland for a follow-up orthopedic evaluation.  (R. at 665-66.)  She rated the pain in her upper lumbar and right upper thigh as "10/10."  (R. at 665.)  During the physical evaluation, Plaintiff had "5/5" bilateral lower extremity strength with intact sensation but "extreme tenderness" in her lumbar spine.  (R. at 665.)  Based upon the examination and MRI results, the physician "[could] not explain [the] reasons for extreme discomfort."  (R. at

665.)  She was instructed to return for further evaluations, and she returned for another MRI on her

right hip on March 5, 2009.  (R. at 661-62, 666.)  The MRI results showed "very mild" degenerative

changes in the right hip and "minimal nonspecific" edema.  (R. at 661.)

Between March 10, 2009, and February 8, 2011, Plaintiff received regular treatment and

therapy for her hip and back pain at Parkland.  (R. at 712-39, 764-88, 847-62, 971-82, 986-1030.)

Her pain had an "unknown etiology," though one Parkland physician believed that she may have

"right meralgia paresthetica."  (R. at 722, 725, 977, 1019.)  Even though she was instructed to

complete 6 weeks of physical therapy, she frequently missed or rescheduled, and one medical record

noted that she had "yet to complete [physical therapy] in 3 years."  (R. at 713-18, 722.)  Her pain

medication was refilled at each appointment.  (*See e.g.,* R. at 719, 769, 971, 974.)

On April 19, 2010, Plaintiff met with Dr. Kris Weber, Ph.D., for a psychological evaluation.

(R. at 790-802.)  Dr. Weber conducted several intelligence assessment tests, but noted that her scores

were "not a good indication of her true intellectual functioning as [Plaintiff] put forth minimal effort

on tasks that required thought and planning."  (R. at 795.)  It was still evident that Plaintiff had

deficits in her intelligence and "limited cognitive flexibility," however.  (R. at 795-96.)  Dr. Weber

opined that she "[did not] want to put forth the necessary effort to make improvements [in her

health], but wants her environment to change or others to change the situation."  (R. at 797.)

Plaintiff was assigned a GAF score of 45-50 and diagnosed with bipolar disorder, borderline

intellectual functioning, and pain disorder "due to hip injury but mostly a function of psychological

factors." (R. at 798.)  Dr. Weber opined overall that Plaintiff was suited for "rote duties and a highly

structured environment," and that she should avoid jobs that required critical thinking, decision

making, and timeliness.  (R. at 801.)

6

On October 5, 2010, Dr. Jim Cox, Ph.D., a state agency medical consultant (SAMC), completed a Psychiatric Review Technique form and a mental residual functional capacity (RFC) assessment for Plaintiff based upon the record.  (R. at 906-23.)  Dr. Cox assessed for affective disorders and diagnosed her with major depressive disorder without psychotic features.  (R. at 909.) He found mild restrictions of activities of daily living and moderate difficulties in maintaining social functioning, concentration, persistence, and pace.  (R. at 916.)  He further found that her ability to understand, remember, and carry out detailed instructions was markedly limited.  (R. at 920.)  Dr. Cox determined overall that Plaintiff could understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers, and respond appropriately to changes in routine work settings.  (R. at 922.)

On October 14, 2010, Dr. Jeanine Kwun, M.D., a SAMC, completed a physical RFC assessment of Plaintiff based upon the record.  (R. at 924-31.)  She found that Plaintiff had the following exertional limitations: could occasionally lift or carry 20 pounds; could frequently lift or carry 10 pounds; stand, walk, or sit with normal breaks for a total of about 6 hours in an 8-hour workday; and an unlimited ability to push or pull.  (R. at 925.)  Plaintiff also had nonexertional limitations: could occasionally crouch and crawl; could frequently balance, stoop, kneel, and climb ramp and stairs; and could occasionally climb ladders, ropes, and scaffolds.  (R. at 926.)  She had no manipulative, visual, communicative, or environmental limitations.  (R. at 927-28.)

On February 8, 2011, Dr. Shiv Sharma, M.D., from Parkland performed a right lateral femoral cutaneous nerve block operation on Plaintiff's right hip.  (R. at 986-1030.)  There were no complications during the procedure, and she was discharged the same day.  (R. at 1019-20.)  After the surgery, she received physical therapy at Parkland where she was issued a "quad cane" to use

during therapy.  (R. at 993-94.)  She continued to complain of hip pain, however.  (R. at 1000-20.)

On February 22, 2011, Plaintiff was referred to the Southwest Spine Institute for an evaluation of her hip and back pain.  (R. at 1033-35.)  She reported "7/10" pain and significant difficulty when she attempted to change positions.  (R. at 1033.)  She also reported that she had received pain management and physical therapy at Parkland, but the physician's assistant noted that it "sound[ed] to [him] that [formal therapy] was just too uncomfortable for her."  (R. at 1033.)  Plaintiff showed a "significant amount" of tenderness in her lumbar spine, and she ambulated with the use of a cane.  (R. at 1034.)  She appeared to be "neurovascularly intact" in her bilateral lower extremities, but she had a slightly antalgic gait.  (R. at 1034.)  She was diagnosed with lower back pain with possible right-sided lumbar radiculopathy.  (R. at 1035.)

On March 8, 2011, Plaintiff met with Dr. R. Mills Robert, M.D., of the Southwest Spine Institute for a follow-up and an MRI.  (R. at 1129-33.)  Dr. Robert reported that the MRI of her hips "appear[ed] fairly normal" with only mild degenerative disc change, and that the MRI of her spine similarly showed only minimal disc protrusion with no obvious nerve root or spinal impingement.  (R. at 1129.)  Plaintiff had some tenderness but showed a "good range of motion" in both hips with normal sensation, strength, and reflexes.  (R. at 1129.)  He recommended sacroiliac joint injections in her right hip.  (R. at 1129.)

On April 12, 2011, Plaintiff met with Dr. Sharon Cebik, M.D., of the Medical and Surgical Clinic of Irving for her hip pain.  (R. at 1084-104.)  She was in no acute distress but demonstrated an abnormal gait with antagia on the right side.  (R. at 1086.)  It was noted that she had a normal mood and orientation to people, place, and time.  (R. at 1086.)  She received X-rays of her right hip and lumbar spine that showed her hip density was normal and that her spine had some "softening

8

of the bone" that was not severe enough to be classified as osteoporosis.  (R. at 1084.)  Dr. Cebik advised Plaintiff to take a Vitamin D supplement twice daily.  (R. at 1084.)

On June 27, 2011, Plaintiff met with Dr. Timothy Zoys, M.D., for an orthopedic evaluation. (R. at 1126-28.)  Dr. Zoys noted that she was in "varying degrees of distress at times during the examination" where her strength would fluctuate between a "3/5" level and "5/5" level.  (R. at 1126.)  He reported tenderness in her lumbar spine and right hip, but had a "limited ability" to assess her because she was guarded and refused to perform certain actions.  (R. at 1127.)  Dr. Zoys could not give an overall assessment because "the parts of the examination that could be done [were] limited and conflict[ed] with observations [of Plaintiff] walking in and out of the exam room."  (R. at 1127.)

On July 21, 2011, Dr. Noelle McDonald, Ph.D., of the Baylor Center for Pain Management (Baylor) conducted a psychological evaluation of Plaintiff. (R. at 1060-63.)  Dr. McDonald reported that Plaintiff had a "happy" and elevated mood and demonstrated no evidence of gross deficit in cognitive functions.  (R. at 1060.)  Plaintiff reported significant pain that caused her to spend "most of her time lying flat on her stomach," though she also reported that she attended church twice a week, was learning how to sew, and enjoyed bowling with some difficulty.  (R. at 1061.)  Dr. McDonald evaluated her as being within the minimal range for depression, the upper limit of the moderate range for anxiety, the average levels of pain severity, and some underlying problems with anger and impulsivity.  (R. at 1062.)  She further opined that Plaintiff had a tendency to "develop somatic complaints in response to underlying stress" and clearly experienced a "preoccupation with pain and physical symptoms."  (R. at 1063.)  Dr. McDonald recommended a physical therapy evaluation and behavioral medicine training.  (R. at 1063.)

On January 5, 2012, Dr. Grant Hellyer, Psy.D., met with Plaintiff for a psychological evaluation.  (R. at 1113-19.)  Dr. Hellyer reported that she did not appear to be in any acute psychological distress and was oriented to person, place, time, and situation.  (R. at 1115.)  He administered multiple intelligence assessments, which showed that her general fund of knowledge was average but her intelligence was scored in the borderline range.  (R. at 1115-16.)  Dr. Hellyer diagnosed her with anxiety disorder NOS and opined that there was little evidence for a depression diagnosis.  (R. at 1117.)  He also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) form on the same day.  (R. at 1109-11.)  He found that Plaintiff had only mild limitations in her ability to carry out complex instructions and to make judgments on complex work-related decisions.  (R. at 1109.)  Dr. Hellyer further opined that she had mild limitations in her ability to interact appropriately with supervisors and co-workers and to respond to usual work situations and changes in routine.  (R. at 1110.)

On March 27, 2012, Plaintiff returned for a second evaluation with Dr. Tuen for her hip and back pain.  (R. at 1121-22.)  Dr. Tuen reported that she had an appropriate mood, good recent memory, and oriented to person, place, and time.  (R. at 1122.)  Her upper and lower extremities had "normal bulk and strength," and she walked with a cane during the assessment.  (R. at 1122.)  He assessed chronic low back pain, but the exam did not show any "motor weakness."  (R. at 1122.)

On October 5, 2012, Plaintiff met with Dr. John H. Peloza, M.D., of the Center for Spine Care for treatment for her back pain.  (R. at 1254-55.)  He reported that Plaintiff's gait was "within normal limits" and she had "good range of motion without pain or tenderness" in her hips.  (R. at 1254.)  Dr. Peloza further reported that she had some pain in the range of motion and tenderness in her spine, but the X-rays of her lumbar spine were normal with no evidence of "instability or

deformity." (R. at 1254-55.) Dr. Peloza's impression was that Plaintiff suffered from "long term mechanical low back pain after a fall without neurologic deficits or complaints." (R. at 1255.)

On July 3, 2013, Dr. Zareena Rafi, M.D., of Metrocare completed a Medical Assessment of Ability to do Work-Related Activities (Mental) for Plaintiff. (R. at 1348-50.) Dr. Raffi diagnosed her with major depressive disorder without psychotic features and a GAF score of 45. (R. at 1349.) Dr. Raffi opined that Plaintiff had "substantial loss of ability to perform" in the following categories: understanding and carrying out instructions; sustained concentration and persistence; responding appropriately to supervision, co-workers, and usual work situations; and adapting to changes in a routine work setting. (R. at 1348-49.) She would be expected to be absent from work more than 4 days a month, and her mental disorders exacerbated the degree of disability from her physical impairments. (R. at 1350.)

From January 7, 2014, to June 18, 2014, Plaintiff received treatment for her back and hip pain at K Clinic chiropractors. (R. at 1316-47.) She consistently reported strong headaches and stiffness in her back and neck. (R. at 1317-24.) Because of her "failure to progress with conservative treatment," she received an MRI on March 12, 2014. (R. at 1327-28.) The MRI of her brain was normal except for minor sinusitis, and the MRI of her cervical spine showed "minimal bilateral foraminal narrowing" with a 2-mm disc bulge but "no definite abnormalities of the thoriac spine, lumbar spine, or skull" were noted. (R. at 1329-32.) Plaintiff discontinued treatment at K Clinic soon thereafter. (R. at 1316.)

### 3. Hearing Testimony

On July 8, 2014, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.[4]

---

[4] A hearing before the ALJ was previously held on October 12, 2012. (R. at 45-63.) This testimony is not included

(R. at 109-46.)  She was represented by an attorney.  (R. at 111.)

        *a.*       ***Plaintiff's Testimony***

Plaintiff testified that she was born on March 20, 1959, and was 55 years old.  (R. at 112.)
She left school in the 10th grade and never received a GED.  (R. at 113, 115.)  She lived alone and
had not worked since 2006.  (R. at 114-15.)  She had a driver's license and was able to drive by
herself.  (R. at 116.)  She supported herself through government assistance, food stamps, and her
"children [would] pitch in and pay things."  (R. at 129.)

In 2000, she worked at Baylor as a "dietician" for "inside of three years."  (R. at 121.)
During that same period, she worked at Child Care Resources, where she would provide child care
at various day cares, and at a "beanie bear shop," where she would stock merchandise and work the
cash register.  (R. at 121-23.)  She last worked for Agape Home Health from 2005 to 2006, where
she was paid $7.00 an hour.  (R. at 117-18.)  After that, she "went to a lot of temp services," but was
unable to find any long-term work.  (R. at 120-21, 126.)  She had stopped looking for work since
then because she "hadn't felt very well" both physically and emotionally.  (R. at 128.)

When questioned about her physical limitations, she stated that she experienced pain in her
whole body, particularly her lower extremities and lower back, because of an "exposed nerve" in
her back.  (R. at 130.)  She took several types of prescription pain pills and muscle relaxers that gave
her dry mouth and fatigue.  (R. at 131.)  She could lift approximately 10 pounds, could stand for up
to 2 hours, and could sit for only 15 minutes at one time.  (R. at 132-33.)  She could only walk 2 or
3 blocks before she lost her breath and had pain in her feet.  (R. at 132.)  Because of these problems,
she began using a cane that she purchased in 2006.  (R. at 132-33, 138-39.)

---

because it is not relevant or cited by either party in their arguments on appeal.  (*See* docs. 22, 24.)

Plaintiff was able to do household "basics" like laundry or cooking, but she could not perform any heavy chores. (R. at 134-35.) She went grocery shopping once a month for "usually two hours" at a time, where she used a wheelchair scooter. (R. at 135.) She had been attending church at least once a week and was able to sit through an entire sermon. (R. at 135-36.) She did not watch television, but she regularly read medical articles and papers that she received from her doctors. (R. at 136-37.) She had between 3 and 4 "bad days" a week on average. (R. at 136.)

When questioned about her mental limitations, Plaintiff stated that she could focus on one task for only 30 minutes at a time. (R. at 134.) She was able to follow written instructions, but it was "a little harder" for her to follow verbal instructions. (R. at 134.) She was "not good" at handling stress, but she could get along well with others. (R. at 134.)

### b.    VE's Testimony

The VE testified that she had reviewed Plaintiff's work history and vocational information and determined that she had the following past relevant work: cashier II, DOT 211.462-010 (SVP: 2, light); hospital food service worker, DOT 319.677-014 (SVP: 2, medium); and home attendant, DOT 354.377-014 (SVP: 3, medium). (R. at 138-40.)

The ALJ asked the VE to consider a hypothetical individual with the same age and education as Plaintiff with the following limitations: could occasionally lift/carry or push/pull 20 pounds; could frequently lift/carry or push/pull 10 pounds; could sit, stand, or walk up to 6 hours in an 8-hour workday; could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs; could never climb ladders, ropes, scaffolds; must avoid concentrated exposure to fumes, odors, dusts, gases, poorly ventilated areas, extreme temperatures, and extreme weather; could understand, remember, and carry out up to 5-step tasks and instructions; and could only occasionally interact

with coworkers, supervisors, and the public.  (R. at 141.)

The VE responded that the hypothetical individual would not be able to perform any of Plaintiff's past relevant work, but could perform the following jobs: routing clerk, DOT 222.687-022 (SVP: 2, light) with 27,200 jobs nationally and 1,250 in Texas; bakery worker, DOT 524.687-022 (SVP: 2, light) with 12,950 jobs nationally and 850 in Texas; and photo copy machine operator, DOT 207.685-014 (SVP: 2, light) with 17,200 jobs nationally and 1,460 in Texas.  (R. at 142.)

The ALJ then asked the VE to add the limitation that she required the use of a handheld assistive device, such as a cane, to ambulate.  (R. at 142.)  The VE responded that there would be no light jobs that the hypothetical individual could perform with all of those limitations.  (R. at 143.)

## C.   <u>The ALJ's Findings</u>

The ALJ issued her decision partially denying benefits on October 10, 2014.  (R. at 18-44.) At step one, she found that Plaintiff had not engaged in substantial gainful activity since April 1, 2009.  (R. at 25.)  At step two, she found that Plaintiff had the following severe impairments: mild degenerative joint disease of the right hip; mild degenerative disc disease; depression; anxiety; asthma; and borderline intellectual functioning.  (R. at 25.) Despite those impairments, at step three, she found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations.  (R. at 25-27.)

Next, the ALJ determined that Plaintiff retained the RFC to perform the following: occasionally lifting and/or carrying, pushing, and/or pulling up to 20 pounds; frequently lifting and/or carrying, pushing and/or pulling up to 10 pounds; standing and/or walking up to 6 hours in an 8-hour workday; sitting up to 6 hours in an 8-hour workday; occasionally balancing, stooping, kneeling, crouching, and crawling; occasionally climbing ramps and stairs; never climbing ladders,

ropes, and scaffolds; must avoid concentrated exposure to pulmonary irritants, such as fumes, odors, dusts, gases, and poorly ventilated areas; able to understand, remember, and carry out "routine up to 5-step tasks;" and occasionally could interact with co-workers, supervisors, and the public.  (R. at 28-33.)

At step four, the ALJ determined that Plaintiff could not perform any past relevant work. (R. at 33.)  At step five, the ALJ relied upon the VE's testimony to find that prior to March 19, 2014, Plaintiff had been capable of performing work that existed in significant numbers in the national economy, including jobs such as routing clerk, bakery worker, and photo copy machine operator. (R. at 34.)  The ALJ then determined that, beginning on March 19, 2014, Plaintiff's age category changed, which resulted in a finding of disabled by direct application of Medical-Vocational Rule 202.02.  (R. at 34-35.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, prior to March 19, 2014, but she became disabled on that date through the date of the decision.  (R. at 35.)

## II.   LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own

judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *Id.*  Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.* at 436.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64.  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## II.   ISSUE FOR REVIEW

Plaintiff presents one issue for review:   Whether the ALJ's RFC finding is supported by substantial evidence.   (doc. 22 at 1.)   She argues that the ALJ failed to properly consider and accommodate all of her limitations when determining her RFC.   (doc. 22 at 5.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184 at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184 at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.  *See* SSR 96-8p, 1996 WL 374184 at *1.  The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision, or all the evidence that she rejected.  *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if it would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires

"more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  A reviewing court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence" supporting the ALJ's decision.  *Id.*  Courts may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *Johnson*, 864 F.2d at 343 (citations omitted).

## A.   <u>Mental Limitations</u>

Plaintiff first contends that the medical evidence supports significantly greater mental limitations than those found by the ALJ.  (doc. 22 at 5-7.)

Here, the ALJ determined that Plaintiff had the severe impairment of borderline intellectual functioning that affected her RFC by limiting her to the ability to understand, remember, and carry-out routine "up to 5-step tasks and instructions" and to only occasionally interact with co-workers, supervisors, and the public.  (R. at 25-28.)  The ALJ noted and directly considered the medical records from Metrocare and the opinions of Drs. Matthews, Weber, McDonald, Hellyer, Cox, and Raffi.  (R. at 30-33.)  She afforded substantial weight to Dr. Hellyer's opinions and little weight to the opinions of Drs. Cox and Raffi because they were "inconsistent with the medical evidence as a whole."  (R. at 31-33.)

Plaintiff argues that the ALJ was "picking and choosing" evidence to support the RFC findings, and she points to the opinions of Drs. Cox and Matthews and her low GAF scores as evidence that her mental impairments caused significantly greater limitations.  (doc. 22 at 5-6.) Dr. Cox reviewed the medical records and opined that Plaintiff's ability to understand, remember, and

carry out detailed instructions was markedly limited (R. at 920-222), and Dr. Matthews opined that she had an impaired attention, concentration, and memory (R. at 639). The ALJ, however, determined in her decision that both of these medical records were inconsistent with the remaining medical evidence and afforded them little weight. (R. at 31-33.) They are inconsistent with Dr. McDonald's records reporting Plaintiff's "happy" and elevated mood with no evidence of gross deficit in cognitive functions, (R. at 31, 1060-62), and Dr. Weber's opinions that Plaintiff's intelligence assessment scores were not a good indicator of her true intellectual functioning because she put forth minimal effort and showed evidence of malingering and secondary gain issues (R. at 30, 795). They are also inconsistent with Dr. Hellyer's opinions that Plaintiff had only mild limitations in her ability to carry out complex instructions and interact appropriately with supervisors and co-workers, as well as the treatment notes from Drs. Tuen and Cebik that Plaintiff had an appropriate mood, good orientation, a normal fund of knowledge, and the ability to cooperate and follow conversations with others. (R. at 591-94, 1084-86, 1121-22l.) Because of these inconsistencies with the remaining examining and non-examining records, the ALJ's decision to afford greater weight to Dr. Hellyer than to Drs. Cox and Matthews is supported by substantial evidence and is consistent with the ALJ's role as the finder of fact. *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005).

Plaintiff also points to her low GAF scores as evidence that she had significant limitations due to her mental impairments, specifically GAF scores from Metrocare and Dr. Weber that ranged between 41 and 50.[5] (R. at 603, 790-803, 1349.) The ALJ did consider these scores in her decision

---

[5] A GAF score between 41 and 50 is classified as "reflecting serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." *Boyd v. Apfel*, 239 F.3d 698, 702 (5th Cir. 2001).

and afforded them "very little weight because the low scores [were] inconsistent with the medical evidence as a whole." (R. at 32.) The ALJ also noted that Dr. Weber specifically reported that his evaluation, including the assigned GAF score, was not a good indication of Plaintiff's true intellectual functioning because she put forth minimal effort during the assessment. (R. at 30, 795.) The ALJ similarly noted that the GAF scores and opinions from Dr. Raffi of Metrocare were "inconsistent with the medical evidence as a whole, which show[ed] a higher level of mental functioning," including the medical records from Drs. McDonald, Tuen, and Cebik that showed no evidence of gross deficit in cognitive functions, and that Plaintiff had an appropriate mood, good orientation, a normal fund of knowledge, and the ability to cooperate and follow conversations. (R. at 31-32, 591-94, 1060-62, 1084-86, 1121-22l.) Accordingly, the ALJ's decision to afford little weight to Plaintiff's GAF scores is supported by substantial evidence in the medical record. *See Hawkins v. Astrue*, No. 3:09-CV-2094-BD, 2011 WL 1107205 at *6 (N.D. Tex. Mar. 25, 2011) (noting that "the GAF scale does not directly correlate to an individual's ability or inability to work"); *see also Nickerson v. Astrue*, No. 3:07-CV-0921-BD, 2009 WL 321298 at *6 (N.D. Tex. Feb. 6, 2009) (observing that "a low GAF score is not determinative of a disability").

Substantial evidence exists to support the ALJ's findings on Plaintiff's mental limitations in the RFC, and the ALJ did not err by rejecting the opinions of Drs. Cox and Matthews on Plaintiff's limitations. As the trier of fact, the ALJ was entitled to weigh the evidence against other objective findings, including the opinion evidence available and the record as a whole. *See Walker*, 158 F. App'x at 535 (quoting *Newton*, 209 F.3d at 458). Accordingly, a reviewing court must defer to the ALJ's decisions. *See Leggett*, 67 F.3d at 564. To the extent that Plaintiff complains of the failure to include more restrictive mental limitations in the RFC, the ALJ did not err, and remand

is not required on this issue.

**B.**    **Physical Limitations**

Plaintiff next contends that the ALJ erred by failing to incorporate her use of a cane for ambulation in the determined RFC.  (doc. 22 at 7-8.)

Here, the ALJ determined that Plaintiff retained the physical RFC to stand, walk, and/or sit for up to 6 hours in an 8-hour workday and to occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs.  (R. at 28-33.)  The ALJ analyzed whether Plaintiff required the use of a cane or other assistive devices and denied that inclusion in the RFC because "there [was] nothing in the medical file showing that the cane was prescribed by a physician" and there was "only mild objective evidence supporting the need for a cane to help with ambulation."  (R. at 30.)

Plaintiff argues that the cane requirement should have been included in the RFC and points to the medical records of her hip pain where "cane and walker use . . . is noted," and where a quad cane was issued by Parkland.  (doc. 22 at 7-8.)  While Plaintiff's use of a cane is sporadically mentioned in the medical records, none of the records state that it was medically necessary, and they instead simply note that she brought her own cane with her to the evaluations.  (R. at 790, 1086, 1122, 1127, 1132.)  The only time where a cane was issued to her was during her physical therapy at Parkland, where she was "referred . . . for evaluation and treatment and fitting with a cane" after her lateral femoral cutaneous nerve block operation in 2011; it was Plaintiff who "request[ed] a quad cane" and not the doctor who prescribed one, however.  (R. at 993.)  The physical therapy records further note that the quad cane was meant to relieve stress on the area after the operation, but they do not state whether it was needed after the completion of physical therapy.  (R. at 992.)  The ALJ considered this and ultimately determined that the record did not support a finding that Plaintiff

22

required a cane to ambulate based upon the remaining medical records, including the records from Drs. Bolesta, Peloza, Zasterova, and Robert, as well as the many X-rays and MRIs that she received. (R. at 28-30.)  The medical records consistently noted that she had "5/5" muscle strength in her lower extremities (R. at 598, 665-66), showed only minor limitations in her range of motion in her spine and hips (R. at 598, 1129, 1254), and had a normal station and gait without the cane (R. at 598, 665, 1254).  Plaintiff's X-rays and MRIs confirmed that she suffered from only minor degenerative changes in her lumbar spine and hip, which did not account for the significant limitations or the need for a cane as reported by Plaintiff.  (R. at 527-28, 543, 653-55, 661, 1084, 1329-32.)

Plaintiff failed to meet her burden to show that she required a cane to ambulate, and substantial evidence in the record supports the ALJ's refusal to include the use of a cane in the RFC. *See Stewart v. Colvin*, No. 1:12-CV-039-BL, 2013 WL 1979738 at *5 (N.D. Tex. May 14, 2013) (finding no error when the ALJ failed to incorporate the use of a cane in a claimant's RFC because the record contained no evidence regarding the medical basis for the cane and there was "no physician's report regarding specific medical restrictions requiring [the claimant] to use an assistive device").  Accordingly, the ALJ did not err, and remand is not required on this basis.

### III. CONCLUSION

The Commissioner's decision is **AFFIRMED.**

**SO ORDERED** this 24th day of March, 2017.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

23